IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | CR 09-01878-TUC-RCC(HCE) |
| Plaintiff, | **REPORT AND RECOMMENDATION** |
| vs. | |
| Jesus Salcido, | |
| Defendant. | |

Defendant Jesus Salcido filed a Motion to Suppress Statements (Voluntariness) (Doc. No. 18) and a Motion to Suppress Statements (Failure to Record) (Doc. No. 19).

For the reasons stated herein, the Magistrate Judge recommends that the District Court deny Defendant's Motion to Suppress Statements (Voluntariness) and Motion to Suppress Statements (Failure to Record).

# I. PROCEDURAL AND FACTUAL HISTORY

## A. Charges

Defendant is charged with knowingly concealing on July 30, 2009 at or near Nogales, Arizona more than $10,000.00 in currency or other monetary instruments, totaling $26,647.00 in United States currency, on his person or other container, and did knowingly attempt to transport and transfer such currency or monetary instrument from the United States to a place outside of the United States, with the intent to evade currency reporting requirements under 31 U.S.C. §5316, in violation of 31 U.S.C. §5332 and 31 C.F.R. §103.23

(Count 1); and knowingly intending to transport on July 30, 2009 at or near Nogales, Arizona monetary instruments of more than $10,000.00 at one time, totaling $26,647.00 in United States currency from the United States to a place outside of the United States, and did willfully fail to file a report as required by the Currency and Foreign Transaction Reporting Act of 1970 as amended in 1986, in violation of 31 U.S.C. §§5316 and 5322, and 31 C.F.R. §103.23 (Count 2).

**B. Procedural History**

Defendant's motions came on for hearing on January 7, 2010 and January 22, 2010. Immigration and Customs Enforcement (ICE) Officer Joseph Martinez (hereinafter "Officer Martinez") testified on behalf of the Government on January 7, 2010 (hereinafter "Martinez 1 at p. _") and on January 22, 2010 (hereinafter "Martinez 2 at p. _"). ICE Officer Adam May (hereinafter "Officer May") testified on behalf of the Government on January 22, 2010 (hereinafter "May at p. _"). Defendant testified on January 22, 2010 (hereinafter "Def. at p._"). Transcripts of the January 7 and January 22, 2010 evidentiary hearing were ordered by the Court, were filed respectively on January 22, 2010 (Doc. No. 36) and February 9, 2010 (Doc. No 44), and are forwarded to the District Court for review. Twelve exhibits were marked for identification and admitted into evidence: Government Exhibits 1 through 6-Photographs of Nogales, Arizona DeConcini Port of Entry waiting room; Government Exhibits 7 through 11-Photographs of Nogales, Arizona DeConcini Port of Entry pat-down room; and Government Exhibit 12-ICE Advisement of Rights form. The exhibits are forwarded to the District Court for review.

**C. Factual Background**

On July 30, 2009 at 6:30 p.m., Officer Martinez, a fluent Spanish-speaking ICE officer of thirteen years, saw Defendant from 30 feet as Defendant was about to exit from the United States through a pedestrian gate into the Republic of Mexico, at the Nogales, Arizona DeConcini Port of Entry. (Martinez 1 at pp. 11-13). Officer Martinez walked over to Defendant, who was accompanied by a three to five year-old girl and who was soon joined by his wife and seventeen year-old nephew. (*Id.* at p. 13). Officer Martinez asked Defendant

if he was going to Mexico and his immigration status in the United States, as well as advising him, his wife and nephew of the reporting requirements and if they had anything to declare. (*Id* at p. 14; Salcido at p. at 49). Officer Martinez recalls Defendant declared $8,000.00 on his person while Defendant recalls having declared $9,600.00. (Martinez 1 at p. 14; Def. at p. 50). Defendant's wife declared $5,000.00 on her person and his nephew declared $3,120.00. on his. (Martinez 1 at pp. 14-15; Def. at p.50). Defendant, his wife, his daughter and nephew were taken to a secondary inspection room. (Martinez 1 at p. 15)

Officer Martinez testified that at the secondary inspection room he found on Defendant "a little over $9,400." (Martinez 1 at pp. 17-18).[1] Discovered in two wallets Defendant's wife had was "over $14,000."[2] and on Defendant's nephew was $3,120.00. (*Id.* at pp. 19-20).The actual amount of currency on Defendant was $9,894.00; on Defendant's wife: $14,551.00; and on Defendant's nephew: $3,120.00 for a total amount of $27,565.00. During the total of twenty minutes time that Defendant, his wife and nephew were inspected, Officer Martinez was professional and courteous. (*Id.* at p. 20; Def. at p. 53).

At approximately 7:20 p.m., Officer May, an ICE officer of close to four years, was called to the Nogales, Arizona DeConcini Port of Entry arriving at approximately 8:05 p.m. (May at pp. 11-12). He was debriefed for twenty to thirty minutes regarding Defendant and his family. (*Id.* at pp. 12-13). Defendant and his family were taken to a waiting room at the main office where they sat together. (Martinez 1 at p. 21). Officer Martinez testified that because Defendant and family were cooperative and there was nothing indicating that the monies found on Defendant and family members were ill-gotten gain, they were allowed to

---

[1] Both Defendant and the Government state in their Motion and Response respectively that the actual amount in Defendant's possession was $9,894.00. (Defendant's Motion to Suppress (Voluntariness) at page 2 line 16; Government's Response to Defendant's Motion to Suppress Statements for Involuntariness at page 2 line 8).

[2] Both Defendant and the Government state in their Motion and Response respectively that the actual amount in Defendant's spouse's possession was $14,551.00. (Defendant's Motion to Suppress (Voluntariness) at page 2 line 22; Government's Response to Defendant's Motion to Suppress Statements for Involuntariness at page 2 line 9).

sit together, although it is not normal procedure. (*Id.* at p. 22). Neither Defendant nor his family were in handcuffs at this time. (*Id.* at pp. 21-22).

A "crossing history" of Defendant was conducted and it was determined that he had flown into the Phoenix, Arizona, airport a number of times from Mexico. (*Id.* at p. 26; May at pp. 12-13). Both Defendant and his wife had a negative criminal history. (Martinez 1 at p. 26). Officers Martinez and May separated Defendant from his wife and family and interviewed him in a pat-down room. (*Id.* at p. 27; May at p. 14). Defendant was not placed in handcuffs. (Martinez 1 at p. 28; Def. at p. 54). The door separating the pat-down room and the waiting room where Defendant's sat was closed. (Martinez 1 at p. 31).

Officers Martinez and May stood approximately five feet away from Defendant when interviewing him in the pat-down room. (May at p. 15). The interview began at approximately 8:30 p.m. (*Id.*). Since Officer May did not speak Spanish, Officer Martinez was used as an interpreter. (Martinez 1 at pp. 31-32; May at pp. 15, 31; Def. at p. 55). Both Officers Martinez and May spoke to Defendant in calm and monotone voices during their interview of Defendant. (Martinez 1 at p. 33; May at p. 16). During the first five minutes of the interview, Defendant was asked biographical questions including if he had employment. (*Id.*). Defendant was advised of his *Miranda* rights in Spanish by Officer Martinez reading them from the Advisement of Rights form. (Martinez 1 at p. 33; May at pp. 16, 18). Defendant was permitted to read the Advisement of Rights form. (Martinez 1 at p. 35; Def. at p. 55). Defendant informed Officers Martinez and May that he understood his rights and that he was willing to talk with them without an attorney present. (Martinez 1 at p.35; May at pp.17-18; Def. at pp. 55-56). Defendant was not forced or threatened to waive his rights and willingly signed the Advisement of Rights form at 8:40 p.m. (Martinez 1 at p. 35; May at p. 18; Def. at p. 56). Defendant opines that he signed the Advisement of Rights form because he had nothing to hide and was not in need of an attorney. (Def. at p. 56).

When Defendant was asked questions by Officer Martinez he appeared anxious, nervous and fidgety. (Martinez 1 at pp. 32, 36-37). Defendant said he was a construction worker but had been laid off and he could not answer where his wife worked or where he

1 could call her if he needed to when she was working.³ (*Id.* at p. 37). When asked his then
2 current financial situation, Defendant answered that the finance company was foreclosing on
3 their home for non-payment. (*Id.* at pp. 37-38). When asked regarding the source of the
4 money, Defendant stated he and his wife had saved it over the course of eight or nine months.
5 (*Id.* at p. 37).

6       Officer Martinez asked Defendant if he was aware of the reporting requirements and
7 Defendant stated he had not understood Officer Martinez' explanation. (*Id.* at p. 38). Officer
8 Martinez reminded Defendant that when he first had contact with Defendant, Officer
9 Martinez had explained the reporting requirements and Defendant had said he understood.
10 (*Id.*). Moreover, it was pointed out to Defendant that he had flown into Phoenix, Arizona,
11 from Mexico and the reporting requirements regarding $10,000.00 were the same. (*Id.*).
12 Defendant then acknowledged that he knew of the reporting requirements. (*Id.* at p. 39; May
13 at p. 21).

14       Defendant maintained that the money he and his wife had was theirs and that the
15 money his nephew had was his nephew's. (May at p. 20). Both Officers Martinez and May
16 did not believe the money belonged to Defendant and his family. (*Id.* at pp.20-21). Officers
17 Martinez' and May's disbelief conveyed to Defendant was based upon the amount of money
18 in question and Defendant's then financial circumstances. (Martinez 1 at pp. 60-61; May p.
19 21). Defendant changed his story stating that the money was his brother's but that a lot of
20 it was his and his wife's. (May at p. 22). Defendant was questioned again and told that if he
21 was taking the money to Mexico for someone else he should be honest. (*Id.*).

---

26       ³Officer Martinez interpreted for Officer May, who does not speak Spanish. Officer
27 May testified that Defendant through Officer Martinez stated that he had been laid off for
nine months as a roofer, and that his wife had worked in an office but was not then currently
28 working. (May at p. 20).

Defendant changed his story once again, stating that the money was not his, but rather his brother-in-law Rene, his daughter's intended godfather[4], had asked him to bring it to Mexico. (May at p. 23; Def. at pp. at 56-57). Someone named Adam or Adan on behalf of Rene, gave him the money at a Phoenix, Arizona, bus depot and Defendant was to bring it to Culiacan, Sinaloa, Mexico, where his daughter was to be christened. (Martinez 1 at p. 39; Def. at pp. 56-57).Defendant implicated Rene because he felt pressured, and because of his daughter's pending christening, Rene's name came to mind. (Def. at p. 57). Defendant explained that he and family had driven from Phoenix to Nogales, Arizona, and left their vehicle at a McDonald's pay parking lot. (Martinez 1 p. 40). Moreover, Defendant believed the money to be the proceeds of narcotics inasmuch as his daughter's intended godfather does not have a visa to enter the United States and has no other business in Phoenix, Arizona, from where the money would originate. (*Id;* May at p. 23). Defendant stated that he made the decision to apportion the money between himself, his wife and his nephew. (May at pp. 23, 41-42).

Neither Officers Martinez and May, nor Defendant raised issues regarding Defendant's immigration status. (Martinez 1 at pp. 40-41; May at p. 24). Officer Martinez did not make threats regarding Child Protective Services taking Defendant's children. (Martinez 1 at p. 41; May at p. 24). Defendant opines that the reason he implicated his daughter's intended godfather was because Officer Martinez threatened to take his child and documents away if he did not cooperate with them. (Def. at p. 47). When Officer May first arrived at the Nogales, Arizona DeConcini Port of Entry he determined that Defendant's wife and child were United States citizens. (May at p. 41). The only time that Child Protective Services would be mentioned is if a parent cannot take physical custody of a child, and even then efforts are still made to have a close relative do so. (Martinez 1 at p. 41).

---

[4]In Spanish, the word for "godfather" is *padrino.* In Mexican culture the *padrino* of a child and the child's *father* refer to one another as *compadre,* a sign of respect for each other as benefactors and protectors of the child. *See* Appleton's New Cuyas English-Spanish and Spanish-English Dictionary (1972).

1   Defendant further opines that added incentive for implicating his daughter's intended godfather was that, despite pressure from Officer Martinez, Officer Martinez assured him that ICE would keep the money, he would be free to leave, and he would simply be fined. (Def. at pp. 47-48). Officers Martinez and May both maintain that they did not tell Defendant he would be fined rather than prosecuted, nor were any other promises made to him. (Martinez 1 at p. 42; May at pp. 24-25).

During the 1½ hour interview, which ended at 10:00 p.m., Defendant did not express a desire to terminate the interview or an unwillingness to answer questions. (*Id.*; May at p. 25). The interview of Defendant was not tape-recorded. (May at pp. 33-34).

## II. ANALYSIS

### A. Motion To Suppress Statements (Voluntariness)

The totality of the circumstances must be examined to determine if law enforcement obtained defendant's statements by overbearing his will. *Schneckloth v. Bustamonte,* 412 U.S. 218, 226 (1973)("In determining whether a defendant's will was overborne in a particular case, the Court has assessed the totality of all the surrounding circumstances-both the characteristics of the accused and the details of the interrogation."); In determining whether a defendant's statement is voluntary, the court:

> ...shall take into consideration all the circumstances surrounding the giving of the confession, including (1) the time elapsing between arrest and arraignment of the defendant making the confession if it was made after arrest and before arraignment, (2) whether such defendant knew the nature of the offense with which he was charged or of which he was suspected at the time of making the confession, (3) whether or not such defendant was advised or knew that he was not required to make any statement and that any such statement could be used against him, (4) whether or not such defendant had been advised prior to questioning of his right to the assistance of counsel; and (5) whether or not such defendant was without the assistance of counsel when questioned and when giving such confession.
> The presence or absence of any of the above-mentioned factors to be taken into consideration by the judge need not be conclusive on the issue of voluntariness of the confession.

1 18 U.S.C. §3501(b); *see also United States v. Shi*, 525 F.3d 709, 730 (9th Cir. 2008)(under totality of the circumstances, statement voluntary because, though defendant was Chinese national who communicated through language specialist, he was given *Miranda* warnings in his native language). A court should also consider the location of the questioning. *See Miranda v. Arizona*, 384 U.S. 436, 457-58 (1966); *United States v. Fisher*, 137 F.3d 1158, 1165 (9th Cir. 1998)(confession voluntary when police assembled occupants in living room to read search warrant, advised them of *Miranda* rights, and interviewed occupants individually).

Practices not deemed to violate the Fifth Amendment's prohibition of coercion in obtaining a confession are: (1) confronting an accused with other evidence of guilt, *United States v. Moreno-Flores*, 33 F.3d 1164, 1170 (9th Cir. 1994); (2) appealing to an accused's emotions, *United States v. Miller*, 984 F.2d 1028, 1031-32 (9th Cir. 1993); or (3) misleading statements, *United States v. Crawford*, 372 F.3d 1048, 1060-61 (9th Cir. 2004). Obtaining statements from an accused by torture or physical coercion does, however, violate the Constitution. and such statements cannot be used at a trial. *United States v. Jenkins*, 938 F.2d 934, 936-40 (9th Cir. 1991).

Herein, the evidence is clear and straightforward. After obtaining biographical information from Defendant, including the fact of Defendant's unemployment, Defendant was advised of his *Miranda* rights in Spanish and permitted to read Spanish-written *Miranda* rights from the Advisement of Rights form. He acknowledged and waived his *Miranda* rights by signing the form.

The line and tone of questioning of Defendant that would be taken by the ICE officers was prompted by Defendant and his family. Defendant and family had been approached by Officer Martinez, who advised them of the reporting requirements and asked if they had anything to declare. Defendant and his wife both declared currency amounts later determined to be less than what they actually carried. Defendant and his wife were was less than forthright.

Defendant's initial explanation that he and his wife had saved $24,445.00[5] over eight months while both were unemployed and that they were losing their home to foreclosure for non-payment, did not ring true to the ICE officers. The ICE officers were not obligated to suspend disbelief and thus they persisted in their questioning of Defendant regarding the source of the money.

Defendant then changed his story and explained that the money was his brother's but that a lot of it belonged to him and his wife. This change of explanation reasonably signaled to Officers Martinez and May that perhaps Defendant was still not proffering the truth. Consequently, the ICE officers told Defendant directly that if he was taking the money to Mexico for someone else he should be honest.

Defendant changed his story once again and explained that the money belonged to his brother-in-law Rene. Defendant went on to state: (1) Rene did not have authorization to be in the United States but nonetheless met Defendant at a Phoenix, Arizona bus depot to give Defendant the money to bring to Culiacan, Sinaloa, Mexico; (2) Defendant and his family were to attend her daughter's christening in Culiacan, Sinaloa, Mexico and Rene was to be her godfather; (3) Rene did not have a legitimate business from where the money could derive, so Defendant surmised the money was proceeds from drug transactions; and (4) Defendant made the decision to apportion the money between himself, his wife, and his nephew.

It stretches credulity that Defendant implicated Rene, his brother-in-law, intended *compadre* and *padrino* to his daughter, in great detail because he felt pressured by Officer Martinez and Rene's name came to mind because Defendant had been thinking of his daughter's christening. This, after first attempting to mislead Officer Martinez regarding the amount being carried; then offering personal parsimony facially discrepant with Defendant's financial condition; then offering his brother as co-owner of the money. The only indicia

---

[5]$27,565.00 less $3,120.00 Defendant ascribed as belonging to his nephew. (May at p. 20).

evidencing Defendant feeling "pressured" is his fidgeting and anxious behavior when Officers Martinez and May continued to ask him questions because they simply did not believe him. On this record, there is nothing before this Court that Officers Martinez and May overreached verbally, psychologically, or physically to break Defendant's will. Particularly so, in light of an un-handcuffed Defendant acknowledging he understood his *Miranda* rights yet never asking to cease the interview nor asking for an attorney because, as he said, he "wasn't hiding anything." (Def. at p. 55-56).

### **B. Motion To Suppress Statements (Failure to Record)**

Defendant explains in his Motion what can only be characterized as good common-sense reasons for recording interrogations. (Defendant's Motion To Suppress Statements (Failure to Record) at p. 5). However, unless and until the utility of doing so is recognized and enacted, there is no failure to record if it is not required. *United States v. Coades*, 549 F.2d 1303, 1305 (9th Cir. 1977).

### **III. CONCLUSION**

Defendant's will to remain silent or desire to consult with an attorney before answering was not overborne by Officers Martinez and May. Defendant made statements post-*Miranda* to Officers Martinez and May freely, wilfully and voluntarily. Such statements were not the result of coercion or threats. Officers Martinez and May were not required to record their interview with Defendant. Any claim that Defendant's will was overborne and would have been evidenced by a recording, goes to the weight of the evidence and can only be tested in the crucible of trial.

### **IV. RECOMMENDATION**

The Magistrate Judge recommends that the District Court deny Defendant's Motion to Suppress Statements (Voluntariness) (Doc. No. 18) and Defendant's Motion to Suppress Statements (Failure to Record) (Doc. No. 19).

Pursuant to 28 U.S.C. §636(b) and Rule 59 of the Federal Rules of Criminal Procedure. any party may serve and file written objections within fourteen (14) days after

being served with a copy of the Report and Recommendation. If objections are filed, the parties should use the following case number: **CR 09-1878-TUC-RCC**.

Failure to file objections in accordance with Fed.R.Cr.P. 59 will result in waiver of the right to review.

DATED this 12th day of March, 2010.

_____
Héctor C. Estrada
United States Magistrate Judge